LOVETT v. UNITED STATES.

WATSON v. SAME.

DODD v. SAME.

Nos. 46026–46028.

Court of Claims.

Nov. 5, 1945.

Charles A. Horsky, of Washington, D. C. (Edward B. Burling, Amy Ruth Mahin, and Covington, Burling, Rublee, Acheson & Shorb, all of Washington, D. C., on the brief), for plaintiffs.

Rawlings Ragland, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., (Donald B. MacGuineas and Henry Weihofen, both of Washington, D. C., on the brief), for the Atty. Gen.

John C. Gall, of Washington, D. C., (Dean Hill Stanley, William F. Howe, Karl M. Dollak, Jos. G. Butts, Jr., and John E. Ritzert, all of Washington, D. C., and Clark M. Robertson, of Milwaukee, Wis., on the brief), for the Congress of the United States.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHALEY, Chief Justice.

On August 26, 1943, plaintiff Robert Morss Lovett was appointed Executive Assistant to the Governor of the Virgin Islands by the Secretary of the Interior, pursuant to authority granted in Section 23 of the Organic Act of the Virgin Islands of the United States, approved June 22, 1936, 49 Stat.1807, 1813, 48 U.S. C.A. § 1405v. He took the oath of office and entered upon the duties thereof October 12, 1943. He performed them thereafter through March 13, 1944, at which time his services ended. He has not been paid the salary of his office for the period November 15, 1943, through March 13, 1944, which amounts to $1,996.40, and this sum he sues to recover.

Plaintiff Goodwin B. Watson was appointed Chief of the Analysis Division, Foreign Broadcast Intelligence Service, Federal Communications Commission, November 16, 1941, by the Federal Communications Commission, and took the oath of office and entered upon the duties thereof on that date, and performed them thereafter through November 21, 1943, when his active services ended. His appointment was made under Section 4 of the Communications Act of 1934, approved June 19, 1934, 48 Stat. 1064, 1066, 47 U.S. C.A. § 154. He sues to recover the salary of his office from November 16, 1943, through November 21, 1943, amounting to $101.78, which he has not been paid.

Plaintiff William Ell. Dodd, Jr., was appointed Assistant News Editor, Foreign Broadcast Intelligence Service, Federal Communications Commission, December 22, 1942, by the Federal Communications Commission, under Section 4 of the Communications Act of 1934, immediately entering upon the duties of that office. He performed those duties thereafter through November 21, 1943. He has not been paid the salary attached to that office for the period from November 16, 1943, through November 21, 1943, which amounts to $59.-83, and he sues herein for that amount.

None of the appointments here involved were made by the President of the United States and confirmed by the Senate.

The three cases have been submitted on stipulations, and they have been briefed and argued together. The general question raised has been the constitutionality of Section 304 of the Urgent Deficiency Appropriation Act, 1943, 57 Stat. 431, 450.

The plaintiffs assert that the section is unconstitutional, setting forth their reasons for that assertion. The Attorney General having heretofore also taken the position that the section was unconstitutional, and still adhering to that position, the Assistant Attorney General, appearing for the defendant, supports the plaintiffs. Special counsel appear in the cases as amici curiae, having been employed to defend the constitutionality of the disputed section. The special counsel are designated variously in the record as representing the House, the Congress, the United States. Their brief is entitled

144

"Brief for the Congress of the United States," and they sign as "Special Counsel for the Congress of the United States." They will hereinafter be referred to as "special counsel."

Insofar as the law involved in these three cases is concerned, they are not to be distinguished one from the other.

■ Special counsel raise the question of jurisdiction. Section 145 of the Judicial Code, 28 U.S.C.A. § 250, governs. The general jurisdiction of this Court in pay cases is too well-known and established to justify re-examination. Section 304, which will be quoted verbatim, in no way indicates that this Court is without jurisdiction. There is not a line or word to that effect. Inferences will not be employed to go to the extent of holding that Congress went so far as to deny these plaintiffs their day in court. The jurisdictional statute is general, and Section 304 contains no exception.

Section 304 is as follows: "Sec. 304. No part of any appropriation, allocation, or fund (1) which is made available under or pursuant to this Act, or (2) which is now, or which is hereafter made, available under or pursuant to any other Act, to any department, agency, or instrumentality of the United States, shall be used, after November 15, 1943, to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Junior, and Robert Morss Lovett, unless prior to such date such person has been appointed by the President, by and with the advice and consent of the Senate: Provided, That this section shall not operate to deprive any such person of payment for leaves of absence or salary, or of any refund or reimbursement, which have accrued prior to November 15, 1943: Provided further, That this section shall not operate to deprive any such person of payment for services performed as a member of a jury or as a member of the armed forces of the United States nor any benefit, pension, or emolument resulting therefrom."

If Section 304 is unconstitutional and of no effect, recovery follows. Special counsel argue that it is not severable. Their argument is not convincing. We are in no doubt about our jurisdiction.

If, on the other hand, Section 304 is a valid exercise of constitutional power, but notwithstanding that plaintiffs are entitled to recover, then it becomes a matter of indifference whether the section is valid or invalid as an exercise of constitutional power.

■ The Court will not reach out gratuitously ·to avail itself of questionable but inapplicable elements in an act and thereby hold it to be unconstitutional. There is always the presumption of validity. The Court will not undertake to say that, because provisions in Section 304, not here operative, are invalid, the whole of the section falls for invalidity.

Much of the argument presented seems to be based on a supposed lack of appropriation. But there was an appropriation. Section 304 refers to an actual appropriation, an "available" appropriation. If "available", the appropriation, as far as these cases are concerned, was available for the payment of these salaries. Availability of the appropriation for other purposes is beside the question. The disbursing agency could divert no part of an appropriation to purposes other than those for which that appropriation was made. Section 304 does not say "otherwise" available, and important words may not be put into the statute that Congress did not place there. There was an appropriation, it was available for the payment of these salaries. If it was not available for the payment of these salaries, then it was clearly not "available" to the administrative bureau. Congress did not limit the appropriation. What it did limit and what it was directed to, was the activities of the disbursing agency. There, and there only, did Congress apply the brake.

Section 304 is notable for what it did not do, as well as for what it did do.

It did not terminate plaintiffs' services. Special counsel insist that it did not work removal from office, and so stated on argument of the cases.

Removal from office is not made an item of damages here. The claim made is only for salary of the office during the time of service, and no longer. We are therefore not concerned with the cause of termination, or in what situation, except for

lack of pay, the plaintiffs found themselves thereafter.

This limitation upon the claims made explains why it has not been necessary in reviewing the facts, to gather in many things that are of record, or of which judicial notice may be taken. Many of the circumstances are interesting only, and in no sense material to disposition of the cases. There is nothing in Section 304 which disturbed plaintiffs' incumbency in office. Special counsel in their brief say: "All that the statute did was to say to the disbursing officers of the Government: After November 15, 1943, you shall not pay out any money to Watson, Dodd and Lovett unless prior to that date they have been appointed by the President and confirmed by the Senate. This was merely a direction to disbursing officers, and in itself created no legal rights in anyone."

■ We repeat, the Court, in passing upon the constitutional validity of a statute will not gratuitously reach out to make use of that which is irrelevant to the case in hand. It was said in Watson v. Buck, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L. Ed. 1416: "A law which is constitutional as applied in one manner may still contravene the Constitution as applied in another. Since all contingencies of attempted enforcement cannot be envisioned in advance of those applications, courts have in the main found it wiser to delay passing upon the constitutionality of all the separate phases of a comprehensive statute until faced with cases involving particular provisions as specifically applied to persons who claim to be injured."

Section 304 does comprehend more than a direction not to pay for the isolated services here rendered. But that "more" is here irrelevant. In terms the section extends to all available appropriations, all disbursing officers, all departments, agencies or instrumentalities of the United States, all personal services of the instant plaintiffs, and is without limitation in time. But in the cases before us we have for consideration only one specified period of employment, and the conditions of that specific employment. We cannot introduce situations which are not before us, and which may indeed never come into be-

ing. It may be repeated, that here we have no claim for damages for removal from office, no petition for compulsory process, solely a claim for the as yet unpaid salary of an office, the duties of which have been performed by the undisputed holder of that office. These are not suits for reinstatement to office. As was said in People of State of California v. San Pablo, etc., Railroad Co., 149. U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747: "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it. No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard."

The incumbent of the office held it de jure. There was no irregularity in the appointment. There was no removal of the officer from the office, no removal of the salary from the office. The appropriation was made and designated as "available." The only appropriation here, in praesenti, is the appropriation available to pay these salaries.

The closer the statute is examined, the more clearly does it appear that with reference to the particular situation we have here, Congress confined itself to one thing —prohibiting the disbursing agencies from paying the salaries of the plaintiffs. The Act is very carefully framed to avoid denying pecuniary obligations. It is a bare caveat issued against the disbursing agency.

As special counsel contend, Congress did not remove from office. The original appointment was unaffected, the office was undisturbed, the compensation was unchanged, the incumbents were not separated from office. They held de jure.

Quoting again from the brief of special counsel: "Section 304 did not deprive plaintiffs of any right to salary. Section 304 denied to the Federal Communications Commission and to the Secretary of the Interior the funds with which to pay plaintiffs: and since under 47 U.S.C., Sec. 154 g and 48 U.S.C., Sec. 1405 v, the power of those agencies to grant plaintiffs a right to salary depended upon the existence of such funds, Section 304 prevented these agencies from granting the right plaintiffs assert."

We are not free to conclude that Section 304 accomplished deviously that which for certainty's sake should have been accomplished directly, if it could be accomplished at all. What it did do directly, not indirectly, constitutionally or unconstitutionally, and nothing more, was to stay the hand of the disbursing agency.

There would have been no occasion for Section 304 to stop payment if the plaintiffs were not holding their respective offices in fact and in law. No disbursing agent had authority to make payment of salaries to men out of office or not entitled to office, and a direction to such an agent not to pay the salary to a legally displaced officeholder would have been something less than an empty gesture. The obvious circumstance that the section was dealing with was one where the plaintiffs were legally and actually in office. Section 304 did not remove them.

It is to no very useful purpose to inquire into the reason for enactment of Section 304. But, it may be remarked in passing, that it is impossible to conclude that Congress meant that in the final outcome, service was to be free to the Government, because the plaintiffs were, in its opinion let us say, unfit for office. It is plain that the plaintiffs, if unfit, were just as unfit serving the Government for nothing, as serving it for something. There is no logic to the proposition that the plaintiffs were to serve the Government for nothing. The proposition is irrational. Unfitness could not be converted into fitness by withholding salary. Yet the statute allowed these plaintiffs to continue in office.

Section 304 is not to be construed beyond its express, explicit terms, nor beyond its incidence in time. It effectually halted the disbursing process in a special situation, at a particular time. We are not here concerned with other situations, other times. The situation, the occasion, has now passed into history. The accomplished event is not now before the Congress and never has been. But it is here and now before this Court.

It is urged that plaintiffs must fail, because the procedure was not followed of having an appointment "by the President, by and with the advice and consent of the Senate," as provided for in Section 304. It has been observed that Section 304 is notable for what it does not say. It does not say that the services of the plaintiffs are terminated, that they shall not continue on under their current appointments. In other words, as special counsel observe, the section did not remove them from office. The plaintiffs did not have to have a presidential appointment in order to continue in office. They did continue in office. It is only the period of their continuance in office, after November 15, 1943, that is involved in this controversy.

In a long line of cases it has been held that lapse of appropriation, failure of appropriation, exhaustion of appropriation, do not of themselves preclude recovery for compensation otherwise due. King v. United States, 1 Ct.Cl. 38; Graham v. United States, 1 Ct.Cl. 380; Curtis v. United States, 2 Ct.Cl. 144; Grant v. United States, 5 Ct.Cl. 71; Collins v. United States, 15 Ct.Cl. 22; Briggs v. United States, 15 Ct.Cl. 48; Parsons v. United States, 15 Ct.Cl. 246; Huffman v. United States, 17 Ct.Cl. 55; Dougherty v. United States, 18 Ct.Cl. 496; Ferris v. United States, 27 Ct.Cl. 542; Sherlock v. United States, 43 Ct.Cl. 161; Strong v. United States, 60 Ct.Cl. 627; Danford v. United States, 62 Ct.Cl. 285; McNeil v. United States, 64 Ct.Cl. 406; Cogswell v. United States, 68 Ct.Cl. 694; Palmer v. United States, 69 Ct.Cl. 260; Crist v. United States, 74 Ct.Cl. 283; Conrad v. United States, 74 Ct.Cl. 289; Wilson v. United States, 77 Ct.Cl. 630; Leonard v. United States, 80 Ct.Cl. 147; Miller v. United States, 86 Ct.Cl. 609; United States v. Langston, 118 U.S. 389, 6 S.Ct.

1185, 30 L.Ed. 164; United States v. Vulte, 233 U.S. 509, 34 S.Ct. 664, 58 L.Ed. 1071.

The provision in Section 304 that no available appropriation shall be used to pay the salaries of these plaintiffs, here in question, does not reach to this Court. Speaking with reference to the constitutional provision that no money shall be drawn from the Treasury but in consequence of appropriations made by law, this Court said (Collins v. United States, supra):

"That provision of the Constitution is exclusively a direction to the officers of the Treasury, who are intrusted with the safekeeping and payment out of the public money, and not to the courts of law; the courts and their officers can make no payment from the Treasury under any circumstances.

"This court, established for the sole purpose of investigating claims against the government, does not deal with questions of appropriations, but with the legal liabilities incurred by the United States under contracts, express or implied, the laws of Congress, or the regulations of the executive departments."

Section 304 made no pretense to determine a legal liability. It assumed no judicial function. It simply prevented a particular disbursement from a particular fund, no more than that if it be taken for just what it says, without inferences. We are confining ourselves, of course, to the precise claims asserted.

In United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356, it was held that an appropriation act could suspend the operation of a prior statute granting certain reenlistment allowances. Granted that an appropriation act may be something more than an accounting process, in the case we have here Section 304 makes no attempt to change or do away with compensation attached to the offices held by the plaintiffs. It merely stopped payment in three specific instances (no other instances are here involved), regardless of obligation.

The obligation was undisturbed. The Act did not say it was destroyed, or even subtly attempt to destroy it, unless we are to indulge in inferences, which we are not disposed to do. It did not say to the plaintiffs: "You are discharged." The status of the plaintiffs was untouched.

The cases cited indicate survival of the obligation in spite of lapse, exhaustion, failure of appropriation. Other reported cases not pay cases, are crowded with instances of unliquidated damages recovered, recovery against the United States being had in the absence of any appropriation at all to pay unliquidated damages, and in the absence of any authority in the disbursing agency to satisfy the litigant's claim.

In the three cases now here considered there was more than in the cases cited. There were in existence "available" appropriations. As heretofore indicated, full value must be given to the express word "available." It can not be changed to "unavailable." If the appropriations could not be used for these offices, then they were unavailable. The statute says they are available, and they must be so considered.

We have pointed out that Section 304 was without time limitation. Congress can not bind itself to discontinue legislation, if it is to go on as a constitutional body. It may therefore repeal Section 304. Section 304 is statutory, not a part of the Constitution. It may or may not turn out to be permanent legislation.

Congress, by enacting Section 304, did not foreclose itself from thereafter appropriating for the payment of these salaries. Congress even now may appropriate, and authorize a selected disbursing agency to pay them. Claims therefor, presented to Congress, may be satisfied by an appropriation to pay them, as claims. Judgments, recovered here, may be satisfied by any appropriation out of which the judgments may be by Act of Congress, payable.

The statute did not separate the plaintiffs from office, it did not take away the salary of that office, it did not prohibit plaintiffs from receiving their salaries. The Act did provide an appropriation for the payment of their salaries. The appropriation for the pay period was there, but it was not made use of. The plaintiffs were appointed lawfully, they continued in office lawfully. Section 304 in no way disqualified them, and we can find no rational basis for construing the Act other-

wise than as a mere stoppage of disbursing routine, nothing more. To construe it as something more is to volunteer inferences. Whether the Congress had the constitutional authority to stop payment, within the limitations of the Act, is immaterial. That which is material is that the salaries have not been paid, that the obligation was never destroyed, and that the obligation continues to this day.

■ In the conclusion arrived at, it is immaterial whether Section 304 of the Urgent Deficiency Appropriation Act, 1943, or any part thereof, is constitutional or not. We do not decide that question. The plaintiffs are entitled to recover in either event. As previously indicated, consideration of Section 304 is necessarily confined to narrow limits, as narrow as the claims themselves.

Plaintiff Robert Morss Lovett in case No. 46026 is entitled to recover $1,996.40; plaintiff Goodwin B. Watson in case No. 46027 is entitled to recover $101.78; and plaintiff William E. Dodd, Jr., in case No. 46028, is entitled to recover $59.83. Judgments will be entered accordingly. It is so ordered.

LITTLETON, Judge, concurs.

WHITAKER, Judge (concurring).

I desire to state very briefly the reason for my concurrence in the result reached by the court.

In the brief filed for the Congress it is argued that the power of that body to appropriate money is without limitation and, hence, that it can attach any condition it pleases on the use of the money appropriated. Even if we accept this statement without limitation, still, section 304 goes much beyond a mere restriction on the use of the money appropriated by that Act. It not only prohibits the use of the money thereby appropriated to pay plaintiffs' salaries, but it also prohibits the use of any money theretofore or thereafter to be appropriated to pay their salaries, either in their present positions or in any other governmental positions, except as jurors or members of the armed forces. This amounts to depriving plaintiffs of their rights as citizens to enjoy the emoluments of office. It is, therefore, an Act

inflicting punishment upon them without a judicial trial.

■ The passage of such an Act is prohibited by clause 3 of section 9 of Article I of the Constitution, which reads: "No Bill of Attainder or ex post facto Law shall be passed." A bill of attainder has been defined by the Supreme Court as "a legislative act which inflicts punishment without a judicial trial. If the punishment be less than death, the act is termed a bill of pains and penalties. Within the meaning of the Constitution, bills of attainder include bills of pains and penalties." Cummings v. Missouri, 4 Wall. 277, 323, 18 L.Ed. 356.

I have no doubt that section 304 of this appropriation Act violates this provision of the Constitution; no judicial tribunal has found them guilty of any crime, but by this Act they have been denied the salary attached to any office they may now or hereafter occupy. Patently, this violates this provision of the Constitution. If it does, it is void, although it was enacted in the exercise of the power of Congress to appropriate money. The grant of any power by the Constitution is subject to the limitation that it must not be exercised in a way that would nullify another provision of the Constitution. See, for instance, Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60; State of Rhode Island v. Massachusetts, 12 Pet. 657, 9 L.Ed. 1233; Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969; Dick v. United States, 208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520.

Since I am convinced that this Act does violate this provision of the Constitution, I find it unnecessary to consider the other constitutional objections to it, to wit, whether it amounted to a removal of these men from office or a denial of due process of law.

Courts never take pleasure in saying that a coordinate branch of the Government has exceeded its constitutional powers; certainly in this case I take no pleasure in saying that Congress has done that which it had no power to do; but since I am convinced that the restriction amounts to a bill of attainder, I am under compulsion to say that the restriction is invalid and, hence, cannot operate to deprive these men

of the salaries to which their positions entitle them.

JONES, Judge (concurring).

I concur in the result.

The single issue in this case is whether Section 304, as worded, is a valid exercise of the constitutional powers of the Congress.

The authority of the Congress to make appropriations, within the framework of the Constitution, is plenary. The power to make appropriations carries with it the power to withhold or deny appropriations. That power has been exercised for generations.

This is as fundamental as the ten commandments.

As to the wisdom of granting or withholding appropriations the courts have no right to pass judgment, granted, of course, that the Congress is acting within the scope of its authority.

The Congress has the sheer power to grant or withhold current appropriations to individuals except for services already rendered, regardless of whether the action taken is wise or unwise. It does not have to assign a reason for such action, and we have no right to ask for a reason.

A member's constituency alone, under our philosophy of government, has a right to call such member to account.

Having the power to appropriate for specified purposes it has the power to limit the use of such funds so long as it is merely a limitation.

If Section 304 merely forbade the use of funds in the bill, or other funds already available in other bills, I would have no hesitancy in holding it a limitation on appropriation.

The true issue is narrowed to whether the expression "or which is hereafter made available under or pursuant to any other act" transforms it from an appropriation to a legislative provision, and whether such legislation deprives plaintiffs of valuable rights as citizens which they would otherwise have under the Constitution.

The language quoted goes beyond a mere limitation on appropriation and becomes, unless affirmatively repealed, a permanent denial of plaintiffs' rights as citizens. A rose remains a rose even though someone calls it a lily.

No one has a right to be employed by the Government, but every citizen, whose rights have not been legally forfeited, is privileged to apply for any position within the Government and to have his application considered on its merits. This is a thing of value not only intrinsically, but because of the satisfaction it brings a man regardless of whether it is ever exercised. The knowledge of its possession is a powerful element in the pursuit of happiness. Section 304 forecloses this right and closes that door of opportunity.

The national government is one of delegated powers in all its branches. All powers not delegated remain with the states or with the people.

The tenth amendment is as follows: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The ninth amendment is as follows: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

The power to provide or deny appropriations is vested in the Congress. There is no other way to take money out of the Treasury. The Constitution provides (Art. I, Sec. 9) "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law * * *."

If Section 304 were a mere denial of appropriation, however unjust it might be, it could not be successfully questioned. But it does not stop with a mere denial of appropriation. It goes far beyond this. It forbids on a permanent basis employment in the future. It thus becomes a permanent legislative ban.

I cannot find within the four corners of the Constitution any power lodged in the Congress to deny these privileges to any citizen, except in the manner prescribed in the Constitution.

The principle of equality was written in the Declaration of Independence before we had a constitution. It was the result of a long struggle of English peoples upward toward the plains of liberty. It is one of our

proudest **traditions.** **It** was carried forward into the Constitution. It shines through almost every provision in that instrument. The Constitution provides for liberty, equality and fair play; and freedom from every form of new and old world caste and privilege, and from the tyranny of wealth and birth. It throws every safeguard around the rights and privileges of the individual citizen.

The right to seek employment is one of the most highly prized rights of the Anglo-Saxon race. When a citizen by his conduct forfeits any of his rights, privileges, and immunities, a method is provided for establishing that forfeiture. That method was not pursued here. One of the chief glories of the Constitution is the fact that you cannot take the shirt from the back of a ragged street urchin without either securing the lad's consent or paying for the rags in the manner prescribed by law. The same is true of his privileges in every form. Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann. Cas. 1917B, 283; Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220; International News Service v. Associated Press, 248 U.S. 215, 236, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293.

Section 304 in making a permanent ban on the rights and privileges of the plaintiffs, exceeds the authority delegated to the Congress by the Constitution.

MADDEN, Judge (concurring in the result).

I agree with the decision of the court, but, because of the importance and variety of the problems presented, I make the following additional observations.

Nothing is claimed to have been done or said or written by any of the plaintiffs which was unlawful. No statute or legal doctrine is brought forward under which it is claimed that they could have been restrained before utterance or action, or punished thereafter by so much as a penny fine. And no indirect adverse legal consequences were attached to what they said or did by any legal doctrine, or by statutes such as the Hatch Act, 18 U.S.C.A. § 61 et seq., or the various provisions in other acts disqualifying for Government employment members of organizations which advocate the overthrow of our constitutional form of government. It is not claimed that they violated those laws. In short, what they did was completely innocent and of interest or consequence to the law of the land as it then was, or, as to all persons except the three plaintiffs, as the law still is. And this was true without any resort to constitutional protections of freedom of utterance or action. The law, wholly apart from the Constitution, did not touch what they had done. But as a consequence of their having done what they did, the three plaintiffs find themselves excommunicated, reduced to the status of three second-class citizens among all of the millions of their fellows. They find themselves subject to the same obligations as their fellow first-class citizens to obey the laws, pay taxes, and serve in the armed forces and on juries; but completely and perpetually disqualified from serving their Government in any of the thousands of positions in which any of the rest of us, if technically capable, may serve. It is not claimed that the three plaintiffs were not competent to perform, or did not faithfully perform, the duties of the positions they held.

Has Congress the power to remove, by statute, named individuals from Government service, and make them perpetually ineligible to hold positions in Government service because they have engaged in conduct which was entirely lawful? Section 304 purports to do this. If it in fact accomplishes it, it has accomplished, under the guise of law, a shocking and outrageous injustice, unique in our history, and discouraging because it follows one hundred and fifty years of experience under the best Government men have devised. The court's problem is not, of course, whether Section 304 is unjust, but whether it is unconstitutional. But when the injustice of the particular law is so shocking, and the threat of its repetition and extension is so menacing to our institutions, as in the case of Section 304, one can hardly be blamed for saying to himself, even before he consults the text of the Constitution, "If the Constitution is the charter of liberty and free government which I have always supported that it is, it does not permit this."

If Section 304 is valid, Congress can disqualify for public office or service racial minorities, political minorities, and, probably, religious minorities. To do so would, indeed, be less unjust than what is done by Section 304. If a racial minority were excommunicated, the statute would at least have one quality of what we have been accustomed to regard as law, the quality of generality of application to all persons of an ascertainable class. No individual would have the finger of the state pointed at him, as these three plaintiffs have, saying "You are degraded, not because of the kind of person you are, for there may be thousands of persons just like you in all essential respects, who are still full citizens; not because of what you have done, for there may be thousands of persons who have done the same things, so far as those things are relevant to a rational state, as you have done. You are degraded because the state has selected you for degradation." And a racial or other minority could under the constitutional protections which would apply even to second-class citizens, pool their resources and agitate for the repeal of the statute with some slight hope that in the turn of political events a powerful party might need the votes of this minority to insure its success, and hence would espouse its cause. But three individuals, such as these plaintiffs, are helpless. If they speak, who will listen? If they should happen to have the money to publish, who will read? Their appeal would appear to be completely selfish. The reaction would be: "Who are these persons, of the dominant race, of many generations of honorable American ancestry, to be complaining of discrimination? I don't know just what has happened to them, but if they can't take care of themselves, nobody can." And nobody can, if Section 304 is valid.

Section 304 is asserted by the plaintiffs to be unconstitutional because (1) it purports to remove the plaintiffs from executive offices, and no power of removal resides in the legislative branch of the Government, except, by impeachment; (2) it is a bill of attainder, or its equivalent, a bill of pains and penalties, which the Constitution forbids: and (3) it deprives the plaintiffs of liberty and property without due process of law, in violation of the Fifth Amendment.

I have no doubt that Section 304 is a bill of pains and penalties and is therefore unconstitutional. It has the ancient flavor of the bills of attainder which were so odious to the makers of our Constitution that they forbade such laws in the main body of the Constitution and before the bill of rights later embodied in the first ten amendments was thought necessary, in that it, like the bills of attainder that the fathers were familiar with, selects its victims as named individuals, and not as persons belonging to any describable class. It punishes them by removal from office and income and disqualification from ever again serving their Government for compensation except in military or jury service. It thus imposes the same penalty which the Senate is authorized to impose, on conviction by a two-thirds vote after impeachment by the House, upon officers guilty of "treason, bribery, or other high crimes and misdemeanors." The question of whether the forfeiture of the right to pursue a public calling was punishment, so that a statute imposing it for past innocent conduct is an ex post facto law and a bill of pains and penalties was settled right in the cases of Cummings, the priest, Cummings v. State of Missouri, 4 Wall. 277, 18 L.Ed. 356, and Garland, the lawyer, Ex parte Garland, 4 Wall. 333, 18 L.Ed. 366.

I think Section 304 violates the Fifth Amendment in that it attempts to deprive the plaintiffs of liberty and property without due process of law. I recognize that the Fifth Amendment does not, like the Fourteenth, which applies only to state governmental action, expressly assure equal protection of federal laws. But a statute which selects persons for punitive action on a completely personal basis, with no attempt to treat similarly other persons similarly situated, is so foreign to our concepts of law that it is difficult to think of it as law at all, though it bears the stamp of legislative enactment. If a legislature refuses to define the conduct which it desires to punish, if done by A, in such terms that B and C and D will be equally punishable if they do it, but instead merely provides that A shall be punished if he does it, the legis-

152

lature engages, not in law making, but in arbitrary action. And this would be true, even if the statute did not, as Section 304 does, attempt to make punishable conduct which was wholly innocent when engaged in. There are indications in opinions of the courts, though the necessity for deciding the questions has not hitherto arisen, that the due process of law which is required by the Fifth Amendment would not be satisfied by the arbitrary selection by the legislature of certain named individuals to be the sole victims of penal laws. In Hurtado v. California, 110 U.S. 516, 535, 4 S.Ct. 111, 121, 292, 28 L.Ed. 232, where the arbitrary action of a state was in question, the court said:

"But it is not to be supposed that these legislative powers are absolute and despotic, and that the amendment prescribing due process of law is too vague and indefinite to operate as a practical restraint. It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case, * * *"

The cases of Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081; Wallace v. Currin, 4 Cir., 95 F.2d 856; Minski v. United States, 6 Cir., 131 F.2d 614; United States v. Ballard, D.C.W.D.Ky., 12 F.Supp. 321, also indicate the same attitude toward governmental action in the guise of law which penalizes persons unequally. I think, therefore, that Section 304 is forbidden by the Fifth Amendment.

It is urged that Section 304, even if it would otherwise be invalid as a trespass by Congress upon the executive function of removal of executive officers, is saved by the provision that these plaintiffs might keep their positions if, within the period of a few months set by the statute, they were appointed by the President and confirmed by the Senate. But no other person in the country had to pursue such a course in order to obtain or hold those positions, or identical or comparable ones. The requirement was intended to be, and was, discriminatory and oppressive as to three selected individuals out of all the people in the country. Under a system of equal justice under law, the three plaintiffs should not be

subjected, in order to get or hold a Government position, to any other or different requirements than the rest of us are subject to. And the Constitution, I think, forbids their being so oppressed.

It is, in effect, urged that even though Section 304 is unconstitutional for any or all of the reasons suggested, there can be no relief for its victims because the Section is a part of an Appropriation Act, and the power of Congress to control expenditures is absolute. It may well be that under our Constitution, and under any constitution which might be devised for a free people, one branch of the Government could, temporarily at least, subvert the Government. The Judges might refuse to enforce legal rights or convict criminals. The President might order the Army and Navy to surrender to the enemy. Congress might refuse to raise or appropriate money to pay the President or the Justices of the Supreme Court and the other courts. But any of these imagined actions would not be taken pursuant to the Constitution, but would be acts of subversion and revolution, the exercise of mere physical power, not lawful authority. And conduct by any branch of the Government less ruinously subversive, but, so far as it goes, equally unconstitutional, is likewise an exercise of physical power rather than lawful authority. I do not think, therefore, that the power of the purse may be constitutionally exercised to produce an unconstitutional result such as a taking of a citizen's liberty or property without due process of law, a conviction and punishment of a citizen for wholly innocent conduct, or a trespass upon the constitutional functions of another branch of the Government. And to whatever extent it is within the jurisdiction of a court to which the question is presented in litigation, to give judgment according to the Constitution, even though that requires the court to disregard a statute which conflicts with the Constitution, the judges are bound by their oaths to give such a judgment. In this case; therefore, we must disregard Section 304. Without it, the plaintiffs are in the position of having performed services for the Government, under lawful appointments for which the Government has refused to pay. Each of them is, therefore, entitled to a judgment.