**ROSS CONSTRUCTION CORPORATION**

v.

**The UNITED STATES.**

**No. 49–65.**

United States Court of Claims.

April 19, 1968.

Gilbert A. Cuneo, Washington, D. C., attorney of record, for plaintiff. Julian E. Goldberg, Philadelphia, Pa., David V. Anthony, Herbert L. Fenster, and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

We held in Anthony P. Miller, Inc. v. United States, 348 F.2d 475, 172 Ct.Cl. 60 (1965), that the Congressional limits on federal mortgage insurance for Capehart Act projects did not prevent a contractor from recovering for losses or expenses incurred as a result of defective government plans or specifications, or for unforeseen conditions falling within the "changed conditions" clause, or on account of Government errors in interpreting the specifications. That case (and

those following it) involved "on-site" construction of residential housing authorized by the Capehart Act. Now we have to decide whether the same rules are to be applied to "off-site" construction and facilities, ancillary to Capehart Act housing but governed by a different statutory limitation. This is entirely a legal question. The relevant facts are undisputed and both sides ask for summary judgment.

The Air Force built a Capehart Act housing project at McGuire Air Force Base in New Jersey. Plaintiff contracted to do the off-site work necessary to connect the streets and utilities of the project to the streets and utilities of the rest of the Base. Performance of the contract led plaintiff to submit various claims to the Government, of which only five remain pertinent. Three of these concerned changed conditions, one an error in the government drawings, and the other an incorrect interpretation of the specifications by the contracting officer. All were appropriately raised under the contract, and as to the last claim due protest was made before the work was done as the defendant ordered. The Armed Services Board of Contract Appeals allowed the five demands in the amount of $125,712.87, but the contractor has been paid only $73,-611.58. This suit is for the remaining $52,101.29.

The barrier interposed by the defendant to full payment is 12 U.S.C. § 1748i (1964), authorizing appropriated funds for land acquisition and installation of outside utilities for Capehart Act housing projects, and restricting such expenditures to "an average of $1,500 per housing unit in respect of any housing project" and "an average of $1,000 per housing unit in respect of all housing projects for which expenditures are approved under" the Capehart Act.[1] Since there were 1,450 units in the McGuire Air Force Base housing project, the statutory limitation, as applied to plaintiff's contract, was $2,175,-000. The ASBCA found that only $73,-611.58 was left out of this maximum, and indicated that that was all plaintiff could receive even though the Board held $125,712.87 would be due on the five granted claims if the statutory limit had not been exceeded. After this administrative decision the parties made a supplemental agreement providing for payment of the $73,611.58, stipulating "that the contractor would be entitled to the entire $125,712.87 if payment is not subject to restrictions under 12 U.S.C. 1748i", and releasing the Government from all claims on this contract "except the contractor's claim in the amount of $52,101.29, which the parties agree is due the contractor if the limitation of 12 U.S.C. § 1748i does not apply."

There are, of course, differences between the limitation provisions of the Capehart Act and that of 12 U.S.C. § 1748i, the major one being that off-site contracts under the latter are paid di-

1. Section 1748i reads as follows:
"§ 1748i. Appropriation for acquisition of land, installation of outside utilities, and site preparation.
There are authorized to be appropriated funds for acquisition of land, installation of outside utilities, and site preparation for housing projects to be constructed under this subchapter. Such funds may be expended by the respective military departments for housing projects when the Secretary of Defense, after consultation with the Federal Housing Commissioner, determines that such housing projects should be constructed and that such expenditures are essential to the construction of satisfactory housing. Such expenditures may not exceed an average of $1,500 per housing unit in respect of any housing project, and shall not exceed an average of $1,000 per housing unit in respect of all housing projects for which expenditures are approved under the provisions of this section."

This section was first enacted in 1951 when military housing was being constructed under the Wherry Act (see Henry Barracks Housing Corp. v. United States, 281 F.2d 196, 150 Ct.Cl. 689 (1960); Congress Constr. Corp. v. United States, 314 F.2d 527, 161 Ct.Cl. 50, cert. denied, 375 U.S. 817, 84 S.Ct. 53, 11 L. Ed.2d 52 (1963), but was retained for Capehart Act housing which succeeded the Wherry Act in 1955–1956.

rectly out of appropriated funds. But *Anthony Miller* made it very plain that the holding in that case was *not* grounded on the system by which appropriations were used only ultimately, but not immediately, to pay the costs of Capehart Act work. On the contrary, the decision treated the Capehart Act, in this respect, as if appropriations were much involved. 348 F.2d at 479–481, 172 Ct. Cl. at 67–69. The court placed its ruling squarely on the general proposition that, absent the most explicit of statutory language, a Congressional limitation on expenditures should not be read as excluding recovery for circumstances over which the contractor could have no control and which were not its fault.

We said that it is "difficult to conclude that Congress meant that the contractor would remain without a remedy" for over-limitation expenses "for additional work caused by errors or defects in the Government's plans and specifications or required by changed conditions encountered in the performance of the contract", and we refused to "attribute to Congress an intention that would produce an impractical, unjust, and unworkable result unless that intention appears clearly on the face of the statute or in the supporting record." 348 F.2d at 480, 172 Ct.Cl. at 68.[2] Later, we pointed out that *Anthony Miller* "stand[s] for the general proposition that maximum contract provisions do not ordinarily control where the contractors suffer additional costs

because of the Government's fault." Scherr & McDermott, Inc. v. United States, 360 F.2d 966, 971, 175 Ct.Cl. 440, 450 (1966).

These considerations apply just as much to 12 U.S.C. § 1748i as to the Capehart Act restrictions. As this case shows, off-site contractors can also suffer losses or increased expenses because of unforeseen changed conditions, defective government specifications, or improper demands by contracting officers for more expensive work. With respect to the limitation, there is no meaningful distinction favoring the on-site builder over the off-site contractor.[3]

If anything, the balance swings the other way because it is more likely that a number of contractors, not just one, will be engaged in the off-site work; it appears here, for instance, that some twelve contracts were awarded for off-site work (governed by § 1748i) at McGuire Air Force Base. We gather that this is not unique. For years this court has made a distinction between contractors paid out of a general appropriation and those contracts for which a specific and limited appropriation is made by Congress. The former have been held not barred at all by exhaustion of the appropriation, on the theory that "a contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its malad-

2. The opinion also pointed out (348 F.2d at 480, 172 Ct.Cl. at 68) the detriment to the Government in giving the statutory limitations a rigid and all-inclusive effect:

"To adopt the government's interpretation would lead to absurd results. Aside from the basic unfairness to the contractor, situations might arise in which the government would be placed in a very difficult position. For example, let us assume that a Capehart contract has been let in which the gross price is very close to the mortgage insurance limit. During construction, a major error in the plans is discovered. It becomes apparent that the expenditure of a sum considerably in excess of the amount of the

insured mortgage will be required to complete the construction. If, in such a situation, the government has to close down the project while it seeks an additional appropriation from Congress, the resulting delay could create a serious hazard to the partially completed houses."

3. The Armed Services Board of Contract Appeals appears to see no difference between the Capehart Act contractor and the § 1748i contractor. In a recent case under § 1748i, Guy R. Allen, ASBCA No. 7213, 67–1 BCA ¶ 6315, the ASBCA summarily dismissed the Government's limitation argument with a citation to *Anthony Miller*, (The instant case was decided by the ASBCA before this court decided *Anthony Miller*.)

ministration or by its diversion, legal or illegal, to other objects." Ferris v. United States, 27 Ct.Cl. 542, 546 (1892). See, also, Dougherty, for Use of Slavens v. United States, 18 Ct.Cl. 496, 503 (1883); Myerle v. United States, 33 Ct.Cl. 1, 25 (1897); Schuler & McDonald, Inc. v. United States, 85 Ct.Cl. 631, 643 (1937); Joplin v. United States, 89 Ct.Cl. 345, 359–361 (1939). The rationale is that a contractor cannot justly be expected to keep track of appropriations where he is but one of several being paid from the fund. In the face of the specific requirements and purpose of § 1748i, we would not apply this reasoning to the extent of bypassing the statutory limitation entirely—even for extras agreed upon by both parties or additional work done without protest—but the principle does counsel against clamping the maximum on expenses or losses beyond the control or responsibility of the § 1748i contractor. To do that would be even more unjust than in the case of the on-site Capehart Act contractor who is ordinarily the only one concerned with the particular housing project.

Our position will not eviscerate the Congressional limitation any more than it did in *Anthony Miller*. As that opinion observed with respect to the Capehart Act's maxima, "Congress was primarily interested in avoiding the windfall profits which had inured to some contractors under prior housing programs and in preventing the military from constructing elaborate and expensive quarters." 348 F.2d at 483, 172 Ct.Cl. at 72. For that reason we held that "simple extras", agreeable to the contractor and the Government, could not exceed the limitation. "To hold otherwise, would open the door to evasion of the statutory mortgage limit by collusive action of the contracting officer and the contractor, or by the unilateral action of the contracting officer and the cooperation of a willing contractor." Ibid. Similarly, we required a good faith protest by the contractor where the defendant, construing a specification, demands the installation of a more expensive item

than the contractor believes required by the contract. Thus, the legislature's prime purpose to prevent escalation of costs through too-expensive housing and equipment is served, without turning the contractor into a helpless victim of the defendant's fault or of unexpected external conditions.

The same Congressional purposes undoubtedly underlay the comparable monetary limitations incorporated in 12 U.S.C. § 1748i for off-site construction ancillary to the housing. That section authorizes "acquisition of land" and "site preparation for housing projects" which could easily prompt inflated costs and elaborate work if no ceiling were imposed, as could "installation of outside utilities" in lesser degree. The Congressional aim to curb waste and extravagance can and will be maintained, for this off-site work, by the same restrictions on extras (express or implied) designed to prevent collusive or evasive attempts to sidestep the limitation.

Earlier decisions of the Supreme Court and this court do not stand in the way of our understanding of § 1748i. All of those on which the defendant relies involved what we have called "simple extras"—additions or changes ordered by the Government on the agreement or acquiescence of the contractor—or other matters for which the contractor should reasonably take or share responsibility. None dealt, so far as we can tell, with changed conditions under a "changed conditions" article, with defective plans or specifications, or with a contested erroneous reading by the Government of some contractual requirement—matters not the fault or the responsibility of the contractor. In Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921), the appropriation limit (the appropriation was for that one specific project) was passed because the Government's inspector miscalculated the work done; the contractor relied on his estimate, though it obviously could have measured its performance for itself and stopped when it reached the

limit.[4] The case was, in effect, one for "simple extras." So with Curtis v. United States, 2 Ct.Cl. 144, 152–153, 154 (1866), in which the appropriation for the San Francisco mint was consumed because the contractor acceded to the defendant's requests for extras ("the claimant appears to have acted with liberality in everything that the officers of the government requested"); Trenton Locomotive & Machine Mfg. Co. v. United States, 12 Ct.Cl. 147, 158–159 (1876), where the Secretary of the Treasury made considerable alterations and additions to the marine hospital at New Orleans, thus exhausting the specific appropriation; and Shipman v. United States, 18 Ct.Cl. 138, 146 (1883), in which the claim was that the plaintiff "did extra work and furnished extra materials."[5] These decisions are all consistent with *Anthony Miller* and what we decide today.

Under the parties' supplemental agreement (referred to above), there is no issue before us other than the applicability to plaintiff's five claims of the limitation in 12 U.S.C. § 1748i. The Board's determination in favor of plaintiff on the merits of its claims is not contested by the Government, and the contractor does not challenge the amount awarded. The conditions specified in *Anthony Miller* (see 348 F.2d at 483, 172 Ct.Cl. at 73) for recovery on claims for changed conditions, defective drawings, and ambiguous specifications—the only types of demand presented in this case—have been fulfilled. Since the statutory limitation does not control these claims, plaintiff must prevail.

The plaintiff's motion for summary judgment is granted and defendant's is denied. Plaintiff is entitled to recover $52,101.29, and judgment is entered to that effect.

---

4. The work was dredging soft material and excavating rock, to be done at unit rates. "About May 15, 1914, it was discovered that through a mistake of the [Government] inspector so much work had already been done that if paid for at the unit rates, it would call for an amount far in excess of the appropriation available. The government engineer in charge ordered operations discontinued immediately; and this contractor had no further connection with the work." 256 U.S. at 577, 41 S.Ct. at 564.

5. United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), involved, not our problem, but a Congressional change in the substantive law via an appropriation act.